UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | | |
|---|---|---|
| **ANGEL DUGAS**<br>**ON BEHALF OF J.V.** | * | **CIVIL ACTION NO. 13-2102** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **COMMISSIONER OF**<br>**SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Angel Dugas ("Dugas") filed an application for childhood disability benefits on August 20, 2007, on behalf of her son, J.V., born November 6, 1997, based on Attention Deficit Hyperactivity Disorder ("ADHD"), Oppositional Defiant Disorder ("ODD") and bipolar disorder with an onset date of February 15, 2002.

Following a hearing where J.V. was unrepresented, Administrative Law Judge ("ALJ") Thomas Bundy issued an unfavorable decision on May 29, 2009. (Tr. 21-32). After the Appeals Council denied J.V.'s request for review (Tr. 1-3), Dugas filed an action for judicial review with this Court on March 22, 2011. [Docket No. 11-0467].

On judicial review, the Commissioner filed a motion for voluntary remand. On November 7, 2011, this Court entered a Judgment in which it reversed and remanded the case.  [Docket No. 11-0467, rec. doc. 13]; (Tr. 293-97).

Following a second administrative hearing, ALJ Lawrence T. Ragona issued a decision on January 9, 2013, denying J.V.'s claim.  (Tr. 226-38).  After the Appeals Council denied review, Dugas, on behalf of J.V., filed the action in this Court on June 20, 2013.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards.  *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:

**(1) Claimant's School Records**.  On October 21, 2008, claimant was suspended after he threw a chair where several students were seated, and punched then threatened to harm a student with a knife.  (Tr. 111-12).  His teacher reported

that he repeatedly displayed this behavior, and she felt that he was a danger to her students and herself.

On January 6, 2009, claimant was expelled for grabbing a student's neck and twisting it, then threatening to kill the teacher. (Tr. 114-16). He then yelled that he was "just joking" in the teacher's face.

On January 21, 2009, claimant was placed on six months probation being truant and ungovernable. (Tr. 128-29; 134).

**(2) Records from Dr. Khorsandi dated to August 3, 2005 to August 31, 2007**. Claimant was treated for ADHD and oppositional defiant disorder/bipolar disorder. (Tr. 139-45). He was prescribed Adderall, Clonidine, Focalin, and Risperdal.

On March 13, 2007, claimant was doing better on medications. (Tr. 140). On August 31, 2007, Dr. Khorsandi reported that claimant's medication were working well in controlling his anger. (Tr. 139).

**(3) Consultative Examination by Paul M. Friedberg, Ph.D., dated December 4, 2007**. Dr. Friedberg observed that while claimant's grades were reportedly "slacking," he received a mastery score in English Language Arts and advanced in the three other areas on the I-LEAP test. (Tr. 146). He had problems with verbal and physical aggression, disruption and over-activity at school. He

reportedly had mood swings often.  His mother reported that he had no peer friends. Medications included Clonodine, Risperdal, Focalin and Depakote.

    Claimant had been diagnosed with ADHD, but had been treated more like he had bipolar disorder.  (Tr. 147).  On examination, he was very talkative, and his speech quality was within normal limits.  His mood was depressed, and affect was restricted.  His thought processes appeared to be logical and coherent, with no preoccupation, delusions, compulsions, obsessive thoughts, or unusual perceptual experiences noted.

    Claimant's insight and judgment appeared to be poor, and there was a minimal level of suicide potential.  His ability to delay gratification and frustration tolerance were also poor.  He presented with bipolar disorder, NOS.  His grades were still good, although he had had severe behavioral disruptions.  His prognosis at that time was quite guarded.

    Dr. Friedberg stated that claimant was obviously extremely bright, given his three advanced scores and one mastery score on his I-LEAP testing.  He further opined that it was possible that claimant was gifted.

    Dr. Friedberg noted no weaknesses in claimant's academic skills.  (Tr. 148). He opined that claimant's diagnoses significantly impacted his social functioning and mildly impacted his academic functioning.  He noted that claimant's

medications did not seem to have him sedated or lethargic.  He observed that claimant's level of arousal and activity were quite high for his age.

Additionally, Dr. Friedberg found that claimant's concentration, persistence, and pace were below level expectations.  He determined that 100% of his speech was understood.  His ability to acquire and use information, move about and manipulate objects and care for himself were all within normal limits.  His ability to interact and relate to others was severely impaired.  His ability to attend and complete tasks was mildly to moderately impaired.

**(4) Childhood Disability Evaluation Form dated August 20, 2007**.

Kelly Ray, Ph.D., determined that claimant's impairments of ADHD and bipolar disorder was severe, but did not meet, medically equal, or functionally equal the listings.  (Tr. 151).  He had no limitation as to acquiring and using information, moving about and manipulating objects, caring for himself, and health and physical well-being and less than marked limitation as to attending and completing tasks and interacting and relating with others.  (Tr. 153-54).

**(5) Report from St. Martin Parish Community Health dated January 20, 2009 to May 6, 2009**.  On January 20, 2009, claimant was having behavior problems and a lot of anger.  (Tr. 426).  He had recently been sent to JCEP

5

alternative school for threatening students.  He had mild moodiness, but had improved with medications.

On February 3, 2009, Cynthia Labiche, APRN, stated that claimant had been doing fairly well over the prior few weeks.  (Tr. 160).  His mood had been more stable with no aggressive behavior.  He was tolerating his medications with no side effects.

The assessment was ADHD, combined type, and anxiety disorder NOS.  He was prescribed Clonidine, Depakote, Risperdal, Vyvanse, and Zoloft.

On March 3, 2009, claimant had been doing fairly well with medication.  (Tr. 430).  His mood had improved, and he was doing better in school.

On May 6, 2009, claimant's mother reported that he had threatened a peer.  (Tr. 432).  He reported some mood swings.  His Depakote level was low.  Ms. Labiche titrated his medications.  (Tr. 433).

**(6) Report from Liberty Healthcare Systems dated May 7-19, 2009**.

Claimant was hospitalized after he threatened to stab two students at school with a homemade shank made of pencils.  (Tr. 173).  He had also had school difficulties in the past, and had been suspended for aggressive behaviors.  Despite his medications, he had shown poor impulse control characterized by aggressive behaviors when faced with stress or frustration with others.

6

Dr. Winston Levy's admitting diagnoses were ADHD impulsive type, and mood disorder NOS. (Tr. 177). He noted that claimant had shown a poor response despite therapy and pharmacological treatment as an outpatient. He stated that claimant's behavior outside of a highly structured environment appeared dangerous to others and, therefore, he appeared to be "gravely disabled" at that point. His Global Assessment of Functioning ("GAF") score was 30.

Claimant was discharged on Depakote, Adderall and Risperdal. (Tr. 174). Dr. Levy noted that claimant tended to have difficulty socializing with peers, but seemed to do well with adults. He opined that claimant showed somewhat of an autistic-like behavior when it came to interacting socially with others.

Dr. Levy recommended followup therapy in the mental health center. He suggested an IE evaluation in the classroom, noting that claimant did better in isolated corals separated from the group.

Claimant's prognosis appeared to be guarded. (Tr. 175). Dr. Levy noted, however, that claimant had a supportive mother and his prognosis would depend on the evolution of his illness as well as his ability to be compliant in taking his medications. His GAF score on discharge was 65. (Tr. 173).

**(7) Records from Dr. John Khorsandi dated October 24, 2007 to March 25, 2009**.  On August 1, 2008, claimant's mood had improved, but he was still hyper.  (Tr. 211).  On November 10, 2008, it was reported that claimant had thrown a chair, and now was going to JCEP.  (Tr. 209).  Depression was added to his diagnoses.

On January 5, 2009, claimant had been depressed for a few weeks and not sleeping well.  (Tr. 421).  He was doing better with Depakote.

**(8) La. Dept. of Education Behavior Reports dated September 26, 2012 to October 2, 2012**.  On September 26, 2012, claimant was suspended for cursing at a female student.  (Tr. 399).

On October 2, 2012, claimant received weekend detention for arguing with another male student during class.  (Tr. 398).

**(9) Childhood Disability Evaluation Form dated July 24, 2009**.  Dr. Kelly Ray determined that claimant's impairments of ADHD, mood disorder NOS, and traits of autistic disorder were severe, but did not meet, medically equal, or functionally equal the listings.  (Tr. 436).  He had no limitation as to acquiring and using information, moving about and manipulating objects, and health and

physical well-being. (Tr. 438-39). He less than marked limitation as to attending and completing tasks and caring for himself. (Tr. 438-39).

Dr. Ray found that claimant had marked limitation as to interacting and relating with others. (Tr. 438). She noted that a recent MER from Resource Management dated July 10, 2009, showed that claimant was making progress and doing much better. (Tr. 165, 438).

**(10) Records from St. Martin Parish Community Health Center dated April 27, 2010 to June 18, 2012**. On April 27, 2010, claimant had been doing fairly well on his current medications. (Tr. 455). His mood had been stable, and he was able to focus well and sleep well. The assessment was ADHD, combined type, bipolar disorder NOS, and anxiety disorder NOS.

On August 17, 2010, claimant continued to do fairly well with his medications. (Tr. 452). His mood had been stable with no acting out. He was tolerating his medications.

On October 3, 2011, claimant had completed therapy and was discharged from the Resource Management clinic. (Tr. 450). He reported that school had been going "pretty good," and that he had not gotten into trouble for a good little while. He had been doing well on his current medications with no aggression,

acting out, or mood swings. He was not sleeping well. Ms. Labiche prescribed Rozerem.

On October 24, 2011, claimant had not been acting out, and had no mood swings. (Tr. 449). He was staying on task at school, but not sleeping at night. He was prescribed Rozerem. (Tr. 450).

On November 23, 2011, claimant was doing well on his medications, and had no complaints from home or school. (Tr. 449). He was tolerating his medications, and his mood was happy with no mood swings.

On April 30, 2012, claimant reported that he was "doing great" on his medications. (Tr. 446). He was attending regular classes, and had no complaints from school. He was doing well with therapy. The assessment was bipolar disorder NOS and ADHD, combined type.

**(11) Records from Parks Middle School dated August 18, 2011 to May 21, 2012**. On August 23, 2011, claimant was suspended for using profane and/or obscene language and willful disobedience. (Tr. 473). On August 30, 2011, claimant was assigned to detention for a dress code violation, disturbing the school /habitually violating rules, and using profane and/or obscene language. (Tr. 474). He had refused to do his work, threw paper at a classmate and broke a

classmate's pencils and pens, crumbled up and threw that student's materials on the floor, and cursed the student.

On September 1, 2011, claimant was assigned to ISS after he pushed another male student, causing him to fall to the ground. (Tr. 475). He was assigned to detention on September 9, 2011, after treating an authority with disrespect and using profane and/or obscene language. (Tr. 476). On September 25, 2011, he was suspended for using profane and/or obscene language and treating an authority with disrespect. (Tr. 477).

On October 5, 2011, claimant was suspended for refusing to obey a teacher, refusing to give up chips in a bag, and hitting another student. (Tr. 477). He was suspended again on October 27, 2011, for fighting, disturbing the school/habitually violating rules and using profane and/or obscene language. (Tr. 478).

On December 15, 2011, he was suspended for aggravated assault to a school district employee, using profane and/or obscene language, and treating an authority with disrespect. (Tr. 479). He was sent to JCEP for 45 days.

On February 24, 2012, claimant was suspended from the bus for throwing a paper airplane at the driver. (Tr. 480). He was assigned to detention again on

March 26, 2012, for refusing to stop talking after being told several times to stop, and refusing to obey the teacher. (Tr. 481).

On April 20, 2012, claimant was assigned to detention for using profane and/or obscene language and disturbing the classroom. (Tr. 482). His conduct grades had improved to As and Bs and one C.

**(12) Records from Acadia Vermilion Hospital dated October 27, 2011 to November 2, 2011**. Claimant was admitted for threatening to stab his sister and mother with a pen. (Tr. 490). His admitting diagnoses were bipolar disorder, NOS, ODD, and ADHD, combined. His GAF score on admission was 28.

On discharge, claimant's condition was stable. (Tr. 491). Dr. Nichole Dickens' prognosis was fair with compliance. (Tr. 492). His GAF score on discharge was 58.

**(13) Report of Dr. Kelly Ray dated December 8, 2011 to January 16, 2012**. Claimant had very few friends, though he reported having a friend at school. (Tr. 522). His best friend rode the bus with him and was two years younger. He said that he liked to read, watch TV, play video games, fish, and paint.

Claimant was fully oriented, and reported normal mood with appropriate affect. (Tr. 524). Speech was goal-oriented, though he sometimes added to

questions being asked. Short-term memory overall appeared to be intact. (Tr. 525). Attention and concentration were fairly normal.

Administration of the Wechsler Intelligence Scale for Children, Fourth Addition, revealed a full scale IQ of average, verbal comprehension of high average, perceptual reasoning and working memory of average, and processing speed of low average. (Tr. 525-26).

A computerized continuous performance test indicated performance largely within normal limits, indicating that claimant's stimulant medication appeared to be working to help with claimant's inattention and impulsivity. (Tr. 530). Dr. Ray stated that it seemed more likely that his mood disturbance or emotional lability was subsumed within the ADHD and ODD diagnoses. She noted that his irritability/anger mood changes resulted from not getting his way. He also exhibited problems accepting authority when being told "no" and sometimes disregarded rules.

Dr. Ray concluded that although claimant had been diagnosed with an anxiety disorder in the past, he did not endorse symptoms that would support an anxiety disorder at that time. She also noted that while claimant exhibited many disruptive behaviors resulting in contact with the court system, he did not currently endorse any values/beliefs consistent with delinquent or asocial

13

behavior. Her diagnoses were ODD, ADHD, combined type, parent-child relational problem, and mood/bipolar disorder, NOS by history. (Tr. 530-31). His GAF score was 40-45. (Tr. 531).

**(14) Claimant and Claimant's Mother's Administrative Hearing Testimony**. At the time of the hearing on October 4, 2012, claimant was 14 years old and in the ninth grade. (Tr. 248-49). He stated that he got along with the bus driver. (Tr. 249). He reported that he had not been suspended that year, but did get Saturday detention for threatening to stab another student. Additionally, he said that he got in trouble at school recently for throwing cereal at a student and cursing another student. (Tr. 256).

Claimant testified that he had a group of friends at school. (Tr. 250). He also reported that he played with his cousins. (Tr. 251). He stated that he played his X-box, rode four-wheelers with his cousin, played football, and read. (Tr. 251-52, 254). He said that he got along well with his grandmother and teachers. (Tr. 254).

Additionally, claimant testified that he missed school a lot because of doctors' appointments. (Tr. 252). He stated that his medication helped him. (Tr. 252-53). He believed that he was making a good bit of progress with his problems. (Tr. 257).

Claimant's mother testified that claimant had a lot of anger, anxiety, and mixed emotions. (Tr. 260). She stated that he was starting to get into trouble at his new school. She reported that he had pulled a knife on his sister, and that they fought a lot. (Tr. 261).

Additionally, claimant's mother testified that claimant did not have friends. She stated that he had two other friends which he had been having since first grade, but had no social activity. She also reported that he had pulled an ink pen and intercom out of a teacher's hand. (Tr. 267).

**(15) The ALJ's Findings**. Claimant argues that the ALJ erred: (1) in failing to apply proper legal standards when evaluating the medical opinion evidence; (2) in failing to properly evaluate the medical opinion evidence; (3) in failing to weigh medical opinion evidence, and (4) in failing to support his finding in the domain of interacting and relating to others with substantial evidence due to a failure to consider all relevant evidence.

Specifically, claimant argues that the erred in weighing Dr. Ray's 2007 opinion while failing to discuss her 2009 and 2012 reports; in failing to weigh Dr. Friedberg's 2007 opinion that claimant's ability to interact and relate to others was severely impaired or Dr. Winston's opinion that claimant appeared to be gravely

15

disabled, and in giving weight to Dr. Ray's 2007 opinion instead of the above findings of Drs. Friedberg and Winston.

In the decision, the ALJ gave great weight to the 2007 opinion of the State agency psychologist, Dr. Ray, because it was "consistent and well supported by the objective evidence of record." (Tr. 151-156, 231). It is well established that "the ALJ has *sole* responsibility for determining a claimant's disability status." (emphasis added). *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (*citing Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994)). Further, the ALJ is free to reject the opinion of any expert when the evidence supports a contrary conclusion. *Id*.

In any event, claimant has not shown any prejudice from the ALJ's failure to specifically address each finding in Drs. Friedberg, Winston and Ray's opinions. To establish prejudice, claimant must show that counsel "could and would have adduced evidence that might have altered the result." *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996). As claimant has not shown how these additional records might have altered the result, this argument lacks merit.

Essentially, claimant's main argument is that the ALJ erred in finding that he had a less than marked limitation in the domain of "interacting and relating with others." [rec. doc. 10, p. 9]; (Tr. 235).

To "functionally equal" the listings, a child's impairment must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). These domains are: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. § 416.926a(b)(1).

Under the regulations, a "marked" limitation is defined as an impairment which "interferes seriously" with a child's ability to independently initiate, sustain, or complete activities. § 416.926a(e)(2). A child's day-to-day functioning may be seriously limited when his impairment limits only one activity or when the interactive and cumulative effects of his impairment limit several activities. *Id*. A "marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning that the Social Security Administration ("SSA") would expect to f ind on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id*.

An "extreme" limitation is defined as an impairment which "interferes very seriously" with a child's ability to independently initiate, sustain, or complete activities. § 416.926a(e)(3). A child's day-to-day functioning may be very seriously limited when his impairment limits only one activity or when the

17

interactive and cumulative effects of his impairment limit several activities. An "extreme" limitation also means a limitation that is "more than marked." *Id*. An "extreme" limitation is the rating that is given to the worst limitations. *Id*. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. *Id*. It is the equivalent of the functioning that the SSA would expect to find on standardized testing with scores that are at least three standard deviations below the mean. *Id*.

Claimant argues that the ALJ erred in finding that he had a less than marked limitation in the domain of "interacting and relating with others." (Tr. 235). In reaching this conclusion, the ALJ noted that while claimant's mother said that he had no friends and was unable to make friends, she testified that he generally got along with others and young adults. (Tr. 235, 261). Additionally, she testified that he had two friends which he had been having since first grade. (Tr. 261). Further, claimant reported to Dr. Ray that he had a friend at school and a best friend who rode the bus with him. (Tr. 522). It is well established that the ALJ's finding as to credibility is entitled to great deference. *Newton*, 209 F.3d at 459.

Additionally, the ALJ found that because claimant's medications helped if he was compliant, he did not have a marked or extreme limitation. (Tr. 235). The records support the ALJ's finding that claimant's condition was controlled by

18

medication. His treating physician, Dr Khorsandi, found that claimant's medications were working well and controlling his anger. (Tr. 139, 421). Additionally, Cynthia LaBiche, his treating psychiatric nurse practitioner,[1] found that claimant's mood improved with medications at the appropriate levels. (Tr. 231, 430, 446, 449, 450, 452, 455). Further, both claimant and his mother testified that his medications helped him. (Tr. 252-53, 262). Moreover, Dr. Ray's most recent report indicated that claimant's stimulant medication appeared to be helping. (Tr. 530).

If an impairment reasonably can be remedied or controlled by medication, treatment or therapy, it cannot serve as a basis for a finding of disability. *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987). Because the medical records support the ALJ's finding, it is entitled to deference.

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

---

[1] Nurse practitioners are not "acceptable medical sources," and "only 'acceptable medical sources' can be considered treating sources, as defined in 20 C.F.R. §§ 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight." *Fontenot v. Comm'r of Soc. Sec.*, 2013 WL 395827, *7 (W.D. La. Jan. 7, 2013)*, report and recommendation adopted*, 2013 WL 416300 (W.D. La. Jan. 30, 2013). However, even though a nurse practitioner is not considered an "acceptable" medical source under the regulations and, therefore, cannot establish the existence of a medically determinable impairment, the Commissioner still may use evidence from these sources to assess the severity of an impairment. *Id*.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed September 4, 2014, at Lafayette, Louisiana.

*C. Michael Hill*
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE